**OFFICE COPY**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re EVERGREEN MUTUAL FUNDS FEE LITIGATION | ) ) ) |
| | MASTER FILE: 04-cv-4453 (RWS) |
| THIS DOCUMENT APPLIES TO: ALL ACTIONS | ) ) ) |

### CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, by and through their counsel, allege the following based upon the investigation

of counsel, which included a review of United States Securities and Exchange Commission

("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, media

reports, news articles, academic literature and academic studies. Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

### INTRODUCTION

1.      This is a federal class action based upon the charging of excessive and improper

fees and expenses to Evergreen mutual fund investors by Evergreen Investment Company

("Evergreen"), and those of its subsidiaries and affiliates also named herein as Defendants.

Defendants then used these fees, in part, to improperly pay and induce brokerage firms to steer

more investors into Evergreen mutual funds (the "Evergreen Funds" or the "Funds"), enabling

the fund managers to reap higher management fees at the expense of the Class. As a result of

their material misrepresentations and omissions and conduct detailed below, Defendants are

liable for violations of the Investment Company Act of 1940 (the "Investment Company Act");

the Investment Advisers Act of 1940 (the "Investment Advisers Act"); New York General

Business Law § 349; and for unjust enrichment and aiding and abetting breaches of fiduciary

duty to a class (the "Class") of all persons or entities who held one or more shares of Evergreen

Funds, as set forth in Exhibit A attached hereto, during the period June 14, 1999 and ending November 17, 2003 (the "Class Period").

2.     In essence, Defendants used Evergreen Fund investor assets to pay kickbacks to brokerages in exchange for the brokerages steering their clients into Evergreen Funds. Defendants referred to this as buying "shelf-space" at the brokerages whereby they made undisclosed and improper payments to brokerages including Morgan Stanley Dean Witter ("Morgan Stanley"), AG Edwards, Salomon Smith Barney, Merrill Lynch and Wachovia Securities[1] to induce them to direct investors into Evergreen Funds. Then, once invested in Evergreen Funds, investors were charged and paid undisclosed fees to Defendants that were improperly used by the Defendants to pay brokers to push Evergreen Funds on still more investors in order to increase the level of investments in Evergreen Funds.

3.     Evergreen was motivated to engage in this undisclosed plan of charging excessive fees to Fund investors to capitalize on their scheme to induce brokers to steer investors into Evergreen Funds. The fees Evergreen collected for managing and advising the Evergreen Funds were calculated as a percentage of the Funds' value and, therefore, increased as the assets invested in the Evergreen Funds grew.

4.     Defendants' practice of charging excessive fees and commissions to Evergreen Funds investors to pay and induce brokers to steer investors into the Evergreen Funds necessarily created insurmountable and unmanageable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but in fact were only concerned with their pay-offs from Evergreen.

---

[1]  Wachovia Securities is the trade name under which Wachovia Corporation, the parent company of Evergreen, provides brokerage services.

5.      The practice of charging excessive fees and commissions also created

insurmountable and unmanageable conflicts of interest for the investment advisers to the

Evergreen Funds who had a duty to act in the best interests of Fund investors, but were, in fact,

only concerned with siphoning fees from the Fund investors to induce brokers to artificially

increase the amount of money invested in Evergreen Funds.

6.      The truth about Evergreen began to emerge on November 17, 2003, when the

SEC and the National Association of Securities Dealers ("NASD") fined and sanctioned the

brokerage house Morgan Stanley for, among other wrongdoing, accepting Defendants'

impermissible payments in exchange for aggressively pushing Evergreen Funds over other

mutual funds through a program known as the "Partners Program." Pursuant to the November

17, 2003 SEC Order Instituting Administrative and Cease-and Desist Proceedings, Making

Findings, and Imposing Remedial Sanctions In the Matter of Morgan Stanley DW, Inc. (the

"Morgan Stanley SEC Cease-and-Desist Order"), Morgan Stanley was required to "place and

maintain on its website within 15 days of the date of entry of the Order disclosures respecting the

Partners Program to include...the fund complexes participating in the program." *See*

http://www.sec.gov/litigation/admin/33-8339.htm at ¶ 43a. As a result, on December 1, 2003,

the Morgan Stanley website acknowledged that Evergreen was one of the fund families that

participated in the Partners Program. *See* www.morganstanley.com/cgi-

bin/morganstanley.com/pressroom.cgi?action=load&uid=306.

7.      In the action against Morgan Stanley, the SEC condemned the practices

complained about herein stating that:

> This matter arises from Morgan Stanley DW's failure to disclose
> adequately certain material facts to its customers...[namely that] it
> collected from a select group of mutual fund complexes amounts in
> excess of standard sales loads and Rule 12b-1 trail payments.

3

*     *     *

> Although the Asset Retention Program and Partners funds'
> prospectuses and SAIs [Statements of Additional Information]
> contain various disclosures concerning payments to the broker-
> dealers distributing their funds, none adequately disclose the
> preferred programs as such, nor do most provide sufficient facts
> about the preferred programs for investors to appreciate the
> dimension of the conflicts of interest inherent in them. For
> example, none of the prospectuses specifically discloses that
> Morgan Stanley DW receives payments from the fund complexes,
> that the fund complexes send portfolio brokerage commissions to
> Morgan Stanley DW or Morgan Stanley & Co. in exchange for
> enhanced sales and marketing, nor do they describe for investors
> the various marketing advantages provided through the programs.

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at*
http://www.sec.gov/litigation/admin/33-8339.htm.

8.      The SEC concluded that such conduct violated Section 17(a)(2) of the Securities

Act of 1933 ("Securities Act"), among other statutes, that prohibits one from obtaining money or

property "by means of any untrue statement of a material fact or any omission to state a material

fact necessary in order to make the statement made, in light of the circumstances under which

they were made, not misleading." *Id.*

9.      In a similar enforcement action, the NASD also condemned the practices at issue

here and concluded that such payments to brokerages violated NASD Rule 2830(k) which

prohibits the type of directed brokerage paid by Evergreen.

10.      The actions of Evergreen created insurmountable, unmanageable conflicts of

interest that were not disclosed and that constituted violations of the Defendants' fiduciary duties

owed to the Funds' investors, and violations of the Investment Company Act and the Investment

Advisers Act. Defendants purposefully omitted to disclose any of the improper excessive fees

and commissions passed on to Plaintiffs and other members of the Class. Defendants concealed

such fees used to induce brokers to push Evergreen Funds as they realized that the inducements

4

created an insurmountable conflict of interest material to any reasonable person deciding whether to invest in Evergreen Funds.

11.     On January 14, 2004, Evergreen's revenue sharing shelf-space program was further exposed when *The Wall Street Journal* reported that "it has found widespread evidence that brokerage firms steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements."

12.     The actions of the Evergreen defendants described herein are no different from those already condemned by the SEC and NASD. As described by Sen. Peter Fitzgerald (R-Ill.) in a January 28, 2004 *Los Angeles Times* article about a Senate committee hearing on mutual funds, the mutual fund industry "is indeed the world's largest skimming operation," tantamount to "'a $7-trillion trough' exploited by fund managers, brokers and other insiders."

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§ 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-33(b), 80a-35(a) and (b) and 80a-47(a); §§ 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15; CPLR § 349; and the common law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to § 44 of the Investment Company Act, 15 U.S.C. § 80a-43, § 214 of the Investment Advisers Act, 15 U.S.C. § 80b-14; 28 U.S.C. § 1331; 28 U.S.C. § 1367(a); and 28 U.S.C. § 1391(b).

15.     Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Defendant Evergreen Distributor, Inc. is headquartered in this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

17.     Plaintiff Blanchard D. Smith held during the Class Period and continues to hold shares or units of the Evergreen Growth & Income Class B Fund, Evergreen VA Municipal Bond Class B Fund, Evergreen Omega Class B Fund, Evergreen Aggressive Growth Class A Fund, Evergreen Adjustable Rate B Fund and the Evergreen Managed Income Fund and has been damaged by the conduct alleged herein. A copy of his verification is attached to Exhibit B, submitted herewith.

18.     Plaintiff William Smith held during the Class Period shares or units of the Evergreen Adjustable Rate Fund and has been damaged by the conduct alleged herein.

19.     Plaintiff Sergio Grobler held during the Class Period and continues to hold shares or units of the Evergreen Health Care Fund, Evergreen Global Opportunities Fund and the Evergreen Utilities and Telecommunications Fund and has been damaged by the conduct alleged herein. A copy of his verification is attached to Exhibit B, submitted herewith.

20.     Plaintiff Gene F. Osburn held during the Class Period and continues to hold shares or units of the Evergreen Omega Fund and has been damaged by the conduct alleged herein. A copy of his verification is attached to Exhibit B, submitted herewith.

21.     Plaintiff Linda M. Allison held during the Class Period and continues to hold shares or units of the Evergreen Omega Fund and has been damaged by the conduct alleged herein.

### Defendants

#### The Parent Company and Subsidiary

22.    Defendant Wachovia Corp. ("Wachovia") is registered as a financial holding company and a bank holding company.  Wachovia provides commercial and retail banking and trust services through banking offices in Connecticut, Delaware, Florida, Georgia, Maryland, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Virginia and Washington, D.C.  Wachovia also provides various other financial services, including mortgage banking, investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, international and securities brokerage services, through other subsidiaries. Wachovia's retail securities brokerage business is conducted through Wachovia Securities, LLC, and operates in 49 states.  Wachovia organizes its businesses into four segments: Capital Management, the General Bank, Wealth Management, and the Corporate and Investment Bank. Wachovia is the parent company of defendants Evergreen Investment Company, Evergreen Investment Management Company, LLC and Evergreen Investment Services, Inc.

23.    Evergreen Investment Company ("Evergreen Investments") is a broadly diversified asset and investment management organization, with products and services distributed across several lines of business.  It serves more than four million individual and institutional investors through a broad range of investment products.  Evergreen Investments manages more than $247 billion in assets (as of September 30, 2004).  Evergreen Investments is a subsidiary and brand name of defendant Wachovia, and the service mark of defendant Evergreen Investment Management Company, LLC.

### The Investment Adviser

24.     Defendant Evergreen Investment Management Company, LLC ("EIMC" or the "Investment Adviser Defendant") is the investment advisor to the Evergreen Family of Funds. EIMC has been managing mutual funds and private accounts since 1932 and managed over $109.4 billion in assets for the Evergreen Funds as of December 31, 2003. EIMC is a wholly-owned subsidiary of Wachovia.

25.     The Investment Adviser Defendant is registered as an investment adviser under the Investment Advisers Act. Fees payable to the Investment Adviser Defendant are calculated as a percentage of fund assets under management. The Investment Adviser Defendant had ultimate responsibility for overseeing the day-to-day management of the Evergreen Funds.

### Trustees and Officers

26.     Defendant Laurence B. Ashkin ("Ashkin") was a Trustee of each of the Trusts (defined herein) in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts during a portion of the relevant time period. As of January 1, 2001, Ashkin retired and became Trustee Emeriti. For his service as Trustee overseeing the Evergreen Mutual Fund complex, Ashkin received compensation of approximately $308,500 during the Class Period. Ashkin violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

27.     Defendant Charles A. Austin, III ("Austin") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Austin has been a Trustee since 1991, and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $503,000 during the Class Period. Austin violated his fiduciary duties to the Funds and the

8

Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

28.     Defendant Arnold H. Dreyfuss ("Dreyfuss") was a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts during a portion of the relevant time period. Dreyfuss became a Trustee in 1999 and retired on January 1, 2001 and became a Trustee Emeriti. For his service as Trustee overseeing the Evergreen Mutual Fund complex, Dreyfuss received compensation of approximately $236,500 during the Class Period. Dreyfuss violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

29.     Defendant K. Dun Gifford ("Gifford") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Gifford has been a Trustee since 1974 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $560,500 during the Class Period. Gifford violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

30.     Defendant James S. Howell ("Howell") was a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts during a portion of the relevant time period. As of January 1, 2000, Howell retired and became Trustee Emeriti. For his service as Trustee overseeing the Evergreen Mutual Fund complex, Howell received compensation of approximately $218,250 during the Class Period. Howell violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

31.     Defendant Leroy Keith Jr. ("Keith") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Keith has been a Trustee since 1983 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $494,000 during the Class Period. Keith violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

32.     Defendant Gerald M. McDonnell ("McDonnell") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. McDonnell has been a Trustee since 1988 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, McDonnell received compensation of approximately $504,000 during the Class Period. McDonnell violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

33.     Defendant Thomas L. McVerry ("McVerry") was a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts during a portion of the relevant time period. McVerry has been a Trustee since 1993 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $524,000 during the Class Period. McVerry violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

34.     Defendant Louis W. Moelchert, Jr. ("Moelchert") was a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts during a portion of the relevant time period. Moelchert became a Trustee in 1999 and remained a

trustee until he resigned on January 2, 2002. For his service as Trustee overseeing the Evergreen Mutual Fund complex, Moelchert received compensation of approximately $420,000 during the Class Period. Moelchert violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

35. Defendant William Walt Pettit ("Pettit") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Pettit has been a Trustee since 1984 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $496,500 during the Class Period. Pettit violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

36. Defendant David M. Richardson ("Richardson") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Richardson has been a Trustee since 1982 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $501,500 during the Class Period. Richardson violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

37. Defendant Russell A. Salton, III ("Salton") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Salton has been a Trustee since 1984 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $549,500 during the Class Period. Salton violated his fiduciary duties to the Funds and the

Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

38.     Defendant Michael S. Scofield ("Scofield") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Scofield has been a Trustee since 1984 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $625,500 during the Class Period. Scofield violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

39.     Defendant Richard J. Shima ("Shima") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Shima has been a Trustee since 1993 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $511,000 during the Class Period. Shima violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

40.     Defendant Richard K. Wagoner ("Wagoner") is and was at all relevant times a Trustee of each of the Trusts in the Evergreen Fund complex charged with overseeing all portfolios in the Trusts. Wagoner has been a Trustee since 1999 and for his service as Trustee overseeing the Evergreen Mutual Fund complex, he received compensation of approximately $427,500 during the Class Period. Wagoner is considered an "interested person" of the funds, as such term is defined in the Investment Company Act of 1940, because of his ownership of shares of Wachovia Corporation, the parent of the Funds' investment advisor. Wagoner violated his

fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

41. Defendant Dennis H. Ferro ("Ferro") is and was an officer of each of the Trusts in the Evergreen Fund complex during a portion of the relevant time period. Ferro violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

42. Defendant William M. Ennis ("Ennis") was an officer of each of the Trusts in the Evergreen Fund complex during a portion of the relevant time period. Ennis violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

43. Anthony J. Fischer ("Fischer") was an officer of each of the Trusts in the Evergreen Fund complex during a portion of the relevant time period. Fischer violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

44. Defendant Carol Kosel ("Kosel") is and was an officer of each of the Trusts in the Evergreen Fund complex during a portion of the relevant time period. Kosel violated her fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

45. Defendant Michael H. Koonce ("Koonce") is and was at all relevant times an officer of each of the Trusts in the Evergreen Fund complex. Koonce violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

46. Defendant Nimish S. Bhatt ("Bhatt") was an officer of each of the Trusts in the Evergreen Fund complex during a portion of the relevant time period. Bhatt violated his

13

fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

47.     Defendant Bryan Haft ("Haft") was an officer of each of the Trusts in the Evergreen Fund complex during a portion of the relevant time period. Haft violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

48.     Defendants Ashkin, Austin, Dreyfuss, Gifford, Howell, Keith, McDonnell, McVerry, Pettit, Richardson, Salton, Scofield, Shima, Wagoner, Ferro, Ennis, Kosel, Koonce, Bhatt and Haft were Trustees or Officers of the Evergreen Funds during the Class Period and are collectively referred to herein as the "Trustee/Officer Defendants."

**The John Doe Defendants**

49.     Defendants John Does 1-100 were any other wrongdoers whose identities have yet to be ascertained and which will be determined during the course of Plaintiffs' counsels' ongoing investigation.

**The Distributors**

50.     Evergreen Distributor, Inc. ("EDI"), a subsidiary of The BISYS Group, Inc., markets the Funds through broker-dealers and other financial representatives. EDI is the principal underwriter for the Trusts, as defined below, and with respect to each class of shares of the Funds. The Trust has entered into a Principal Underwriting Agreement with EDI with respect to each class of the Funds.

51.     Evergreen Investment Services, Inc. ("EIS"), a subsidiary of Wachovia, serves as administrator to each of the Funds, subject to the supervision and control of the Trust's Board of Trustees (the "Board of Trustees" or the "Board"), and distributor of the Evergreen Funds. EIS

provides the Evergreen Funds with facilities, equipment and personnel and is entitled to receive annual fees from each of the Funds.

52.     EDI and EIS are referred to collectively herein as the "Distributor Defendants."

**Nominal Defendants: The Evergreen Funds**

53.     Nominal defendants, the Evergreen Funds, as identified on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by the Funds' shareholders, all having a Board of Trustees charged with representing the interests of the shareholders in the funds. The Evergreen Funds are named as nominal defendants solely to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

54.     Evergreen has organized its Funds into separate trusts ("Trusts") where each Fund is a series of its respective Trust. For example, according to the February 1, 2003 Statement of Additional Information for the Evergreen Equity Trust, which includes various classes of numerous Evergreen Funds (the "SAI"), there were nine Trusts that made up the Evergreen Fund complex. Each Trust is an open-end management investment company. An open-end company is a management company that "offer[s] for sale or has outstanding any redeemable security of which it is the issuer." 15 U.S.C. § 80a-5. A redeemable security is defined as "any security…under the terms of which the holder, upon its presentation to the issuer…is entitled…to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof. 15 U.S.C. § 80a-2(a)(32). Each Trust registers with the SEC numerous subdivisions referred to as "funds," "portfolios" or "series" (the "Evergreen Funds" or the "Funds"). For example, the Evergreen Equity Trust and the Evergreen Select Equity Trust have registered with the SEC, on a single Form N-1A, fifteen different Evergreen Funds

including the Evergreen Omega Fund and the Evergreen Aggressive Growth Fund. The Evergreen Trusts are collectively referred to herein as the "Trusts."

55. All the Evergreen Funds are alter egos of one another. The Funds are mainly pools of investor assets that are managed and administered by a common body of officers and employees of Evergreen who administer the Evergreen Funds and portfolios generally. The individual Evergreen Funds have no separate or individual officers, trustees, advisors or employees, have no independent will, and are totally dominated by Evergreen and the common body of trustees established by Evergreen. Thus, in substance, the Evergreen Funds function as components of one unitary organization.

56. All Evergreen Funds share the Investment Adviser Defendant as their investment adviser and share the Distributor Defendants as their distributor. Additionally, Evergreen pools together fees and expenses collected from the Evergreen Funds investors, resulting in the Evergreen Funds sharing expenses with one another. The SAI, made available to Evergreen Funds investors upon request and which is virtually identical in substance to all Evergreen SAIs issued during the Class Period, describes how costs for research services are commingled and shared by the various Funds:

> The Fund pays for all charges and expenses, other than those
> specifically referred to as being borne by the investment advisor,
> including, but not limited to, (1) custodian charges and expenses;
> (2) bookkeeping and auditors' charges and expenses; (3) transfer
> agent charges and expenses; (4) fees and expenses of Independent
> Trustees; (5) brokerage commissions, brokers' fees and expenses;
> (6) issue and transfer taxes; (7) applicable costs and expenses
> under the Distribution Plan (as described above) (8) taxes and
> trust fees payable to governmental agencies; (9) the cost of share
> certificates; (10) fees and expenses of the registration and
> qualification of the Fund and its shares with the SEC or under state
> or other securities laws; (11) expenses of preparing, printing and
> mailing prospectuses, SAIs, notices, reports and proxy materials to
> shareholders of the Fund; (12) expenses of shareholders' and
> Trustees' meetings; (13) charges and expenses of legal counsel for

16

the Fund and for the Independent Trustees on matters relating to the Fund; (14) charges and expenses of filing annual and other reports with the SEC and other authorities; and (15) all extraordinary charges and expenses of the Fund.

\*　　　\*　　　\*

On behalf of the Fund, the Trust has entered into an investment advisory agreement with the Fund's investment advisor (the "Advisory Agreement"). Under the Advisory Agreement, and subject to the supervision of the Trust's Board of Trustees, **the investment advisor furnishes to the Fund... investment advisory, management and administrative services, office facilities, and equipment in connection with its services for managing the investment and reinvestment of the Fund's assets. The investment advisor pays for *all* of the expenses incurred in connection with the provision of its services.**

\*　　　\*　　　\*

**It is impracticable for the investment advisor to allocate the cost, value and specific application of such research services among its clients because research services intended for one client may indirectly benefit another.**

[Emphasis added.]

57.　　Similarly, the SEC issued a report in December 2000 titled "Division of Investment Management: Report on Mutual Fund Fees and Expenses" where it was noted that "...many fund expenses, including the management fee, are incurred at the portfolio level and then allocated among a fund's classes typically based on the relative net assets of each class." *See* http://www.sec.gov/news/studies/feestudy.htm.

## DEFENDANTS IMPROPERLY USED INVESTORS'
## ASSETS TO UNDULY INFLUENCE BROKERS
## TO PUSH EVERGREEN MUTUAL FUNDS

### Defendants Used Improper Means to Acquire "Shelf-Space" at Brokerages

58.     Unbeknownst to Plaintiffs and other members of the Class, Evergreen used the

assets of its mutual fund investors to participate in "shelf-space programs" at various brokerages,

including, but not limited to, Morgan Stanley, AG Edwards, Salomon Smith Barney, Merrill

Lynch and Wachovia Securities.  Evergreen improperly paid these and other brokerages to

aggressively push Evergreen Funds on unwitting investors.  Evergreen made these payments

through a variety of means including: directing the trades – and the lucrative commissions – in

the securities and other investments of the underlying investment portfolios of the Evergreen

Funds to these brokerages ("directed brokerage"); paying excessive commissions under the guise

of "Soft-Dollars," as defined below; and, making other improper payments used as inducements

to brokerages to steer their unwitting clients into the Evergreen Funds.

59.     These *quid pro quo* "shelf-space" agreements between Defendants and the

brokerage firms called for millions of dollars in additional compensation to be paid from

Defendants to the brokerages as incentive to steer unwitting investors into the Defendants'

Funds, resulting in inflated fees being paid by investors.

60.     The payments for these *quid pro quo* arrangements with brokerage houses came

in the form of "revenue sharing" payments, improper and excessive "soft dollars," and 12b-1

fees, among other improper inducements.

**Defendants Paid Brokerages to Push Their Unwitting Clients into Evergreen Funds**

61.     Defendants regularly made revenue sharing payments to brokerage houses as part of the *quid pro quo* "shelf-space" arrangements. In other words, Defendants paid the brokerage houses and their brokers to push their clients into the Evergreen Funds. To the extent revenue sharing payments were made in the form of commissions or otherwise, the Investment Advisers recouped these payments through their management fees, thereby directly diminishing investors' holdings in the Funds.

62.     According to a former Evergreen Investment Services sales manager responsible for Evergreen mutual fund sales during the Class Period and a former Evergreen Investment Services supervisor of sales responsible for reporting Evergreen mutual fund sales during the Class Period, Evergreen partnered with various brokerage firms in order to push Evergreen Funds on unwitting investors. One method in which Defendants accomplished this was by paying greater commissions to brokers to push the Evergreen Funds.

63.     According to the former Evergreen Investment Services sales identified in the preceding paragraph, Evergreen wholesalers were also given budgets to further entice brokers to push Evergreen Funds on their clients. Moreover, brokers who pushed the most clients into Evergreen Funds would be rewarded with trips to exotic locations.

64.     According to a former Evergreen wholesaler who was involved in the sale of Evergreen Funds during the Class Period, the practices described directly above resulted in brokers expressing that they were not recommending Evergreen Funds because they believed them to be in the best interest of their clients, but rather because the brokers believed they would get more in compensation for pushing the Evergreen Funds.

**Defendants' Improper "Shelf-Space" Arrangements With Morgan Stanley**

65.     According to internal Morgan Stanley documents as well as former Morgan Stanley brokers who worked for Morgan Stanley during the Class Period, the "shelf-space program" in which Evergreen participated at Morgan Stanley was called the "Asset Retention Program," later renamed the "Partners Program." The Partners Program was nothing more than a vehicle for enabling a series of veiled payments by Evergreen to Morgan Stanley to steer unknowing investors into Evergreen Funds. **Under the "Partner's Program," Morgan Stanley brokers improperly and aggressively pushed Evergreen Funds on unwitting clients solely because they received more cash to do so, not because such funds were in the best interests of the investors.** According to Morgan Stanley internal documents, Evergreen paid millions of dollars during the Class Period in directed brokerage and other means as part of the *quid pro quo* arrangement with Morgan Stanley to participate in the Morgan Stanley Partners Program. In numerous enforcement actions to date, such payments have been condemned by the SEC as being improper and creating conflicts of interest that were not properly disclosed to investors.

66.     According to the Morgan Stanley SEC Cease-and-Desist Order:

> The selective marketing programs that Morgan Stanley DW operated, initially known as the Asset Retention Program and later as the Partners Program, created an undisclosed conflict of interest because Morgan Stanley DW was authorized to offer and sell shares of approximately 115 mutual fund complexes, but the firm and its FAs received additional compensation for the sale of the mutual funds of a select group of fund complexes.

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at* http://www.sec.gov/litigation/admin/33-8339.htm.

67.     Similarly, the NASD issued a news release, titled "NASD Charges Morgan

Stanley with Giving Preferential Treatment to Certain Mutual Funds in Exchange for Brokerage

Commission Payments" (the "November 17 NASD News Release"), which explained that:

> ...Morgan Stanley operated two programs - the Asset Retention
> Program and the Partners Program - in which it gave favorable
> treatment to products offered by as many as 16 mutual fund
> companies out of a total of over 115 fund complexes that could be
> sold by the firm's sales force. In return for these brokerage
> commissions and other payments, mutual fund companies received
> preferential treatment by Morgan Stanley...

*See* The November 17 NASD News Release, *at*
http://www.nasdr.com/news/pr2003/release_03_051.html.

68.     Through the Partners Program, Evergreen paid excessive commissions to Morgan

Stanley brokers to induce them to sell Evergreen Funds. According to brokers employed by

Morgan Stanley during the Class Period, and internal Morgan Stanley documents, pursuant to the

Partners Program, Morgan Stanley adopted a broker "Incentive Compensation" payout grid that

provided up to 3% greater compensation for sales of "asset-based products" versus "transaction-

based products." Evergreen Funds were classified as "asset-based products," while non-Partner

Program funds were classified as "transaction-based products" and resulted in a smaller payout

to the broker.

69.     Under the compensation grid discussed above, for instance, a broker whose

annual production is over $1 million received 42% of the commissions on "asset-based products"

and 40% of the commissions on "transaction-based products." Accordingly, brokers generally

received a higher payout from the sale of Evergreen Funds than "non-Partner" mutual funds.

70.     Because of the improper use of mutual funds' assets paid out as inducements by

Evergreen, Morgan Stanley's management made it clear through firm-wide memos that it wanted

its brokers to take advantage of the payout grid by directing investors into Evergreen Funds. As

stated by Bruce Alonso, the managing director of Morgan Stanley's Investor Advisory Services Division, in a firm-wide message entitled "An Important Message from Bruce Alonso Regarding the 2003 Compensation Plan" circulated throughout Morgan Stanley in December of 2002: "the recently announced 2003 Compensation Plan provides you with the opportunity to increase your overall compensation by focusing on asset-based products," *i.e.*, Evergreen Funds.

71.     Additionally, in order to further push Evergreen Funds and reap the benefits of the extra inducements from Evergreen, Morgan Stanley management gave Evergreen Funds priority placement in the review of fund materials to be distributed to Morgan Stanley brokers; gave Evergreen access to Morgan Stanley's branch system at the branch managers' discretion; gave Evergreen direct access to Morgan Stanley brokers; included Evergreen in Morgan Stanley broker events; and invited Evergreen to participate in programs broadcasted to brokers over Morgan Stanley's internal systems.

72.     In the Administrative Proceeding against Morgan Stanley, the SEC found that:

> In exchange for participation in the program, the Asset Retention Program Participants paid Morgan Stanley DW: (i) 15 or 20 basis points ("bps") on gross sales of open-end, variable-priced mutual fund shares (the "gross sales payments") and (ii) 5 bps on aged assets (participating fund shares held over one year), which the firm then paid to the FAs responsible for the accounts holding these assets. **These payments were in addition to existing payments such as commissions, 12b-1 fees, shareholder servicing fees and account maintenance fees.**
>
> In return for their payments, program participants received a number of marketing benefits. First, **Morgan Stanley DW included all Asset Retention Program Participants on its "preferred list," which was a list of fund complexes that FAs should look to first in making recommendations of mutual fund products.** Second, it ensured that **Asset Retention Program Participants had a "higher profile" in Morgan Stanley DW's sales system than non-participating fund complexes** by, among other things, increasing the visibility of the Asset Retention Program Participants on its FAs' [Financial Advisers] workstations. Third, the program participants were eligible to

participate in the firm's 401(k) programs and to offer offshore fund products to Morgan Stanley DW's customers.

**Morgan Stanley DW also provided "incentives designed to support long-term mutual fund asset retention goals."** In particular, Morgan Stanley DW paid the 5bps component of the Asset Retention Program payment to FAs, thus incentivizing FAs to encourage their customers to make, and then retain over the specified time period, their investments in mutual fund complexes participating in the Asset Retention Program.

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at* http://www.sec.gov/litigation/admin/33-8339.htm [Emphasis added.]

73. Similarly, the November 17 NASD News Release stated that:

[T]he participating mutual fund companies [including Evergreen] paid Morgan Stanley an extra 15 to 20 basis points on each sale. This was over and above the normal fees earned by the firm for selling the funds.

*See* November 17 NASD News Release, *at* http://www.nasdr.com/news/pr2003/release_03_051.html.

74. The revenue sharing arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors. As stated in the February 1, 2002 Prospectus for the Evergreen Domestic Growth Funds, which includes various classes of the Evergreen Aggressive Growth Fund and the Evergreen Omega Fund, among others, and is virtually identical in substance to all Prospectuses issued during the Class Period, these fees, which include management fees and 12b-1 fees, are "expenses that are deducted from fund assets." These fees were assessed against shareholders and immediately affected the current redemption value of their shares. These fees included amounts sufficiently large to pay revenue sharing expenses directly or to reimburse the investment advisor, distributor or their affiliates for such payments. As explained in the November 17 NASD News Release:

This extra compensation paid to Morgan Stanley for the preferential treatment included millions of dollars paid by the mutual funds through commissions charged by the firm for trades it executed for the funds. These commissions were sufficiently

large to pay for the special treatment, as well as the costs of trade execution.

*See* The November 17 NASD News Release, *at*
http://www.nasdr.com/news/pr2003/release_03_051.html.

### The Fine and Censure of Morgan Stanley for its Involvement with Evergreen And Other Preferred Partners

75.     Morgan Stanley is just one of the brokerage houses to which Evergreen made

improper inducement payments in order to have Evergreen Funds improperly pushed on

investors. For its role in accepting these payments from Evergreen, among other wrongdoing,

Morgan Stanley has been fined and censured by the SEC and NASD and has agreed to pay fines

totaling $50 million. On November 17, 2003, the SEC issued a press release (the "November 17

SEC Release") that announced:

> [T]he institution and simultaneous settlement of an enforcement action against Morgan Stanley DW Inc. (Morgan Stanley) **for failing to provide customers important information relating to their purchases of mutual fund shares**. As part of the settlement, Morgan Stanley will pay $50 million in disgorgement and penalties, all of which will be placed in a Fair Fund for distribution to certain Morgan Stanley customers.
>
> *               *               *
>
> The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934. Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities. Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. **The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.**
>
> *               *               *
>
> The NASD also announced today a settled action against Morgan Stanley for violations of NASD Rule 2830(k) arising from the Partners Program and its predecessor.

*See* SEC Charges Morgan Stanley With Inadequate Disclosure in Mutual Fund Sales - Morgan Stanley Pays $50 Million To Settle SEC Action, November 17, 2003, *at* http://www.sec.gov/news/press/2003-159.htm. [Emphasis added.]

76. The November 17 NASD News Release stated:

> [The] NASD today announced that it sanctioned Morgan Stanley
> DW Inc. for giving preferential treatment to certain mutual fund
> companies in return for millions of dollars in brokerage
> commissions.
>
> \*     \*     \*
>
> This conduct violated NASD's "Anti-Reciprocal Rule," Conduct
> Rule 2830(k), which prohibits members from favoring the
> distribution of shares of particular mutual funds on the basis of
> brokerage commissions to be paid by the mutual fund companies,
> as well as allowing sales personnel to share in directed brokerage
> commissions. One important purpose of the rule is to help
> eliminate conflicts of interest in the sale of mutual funds.

*See* The November 17 NASD News Release, *at*
http://www.nasdr.com/news/pr2003/release_03_051.html; *see also* NASD Rule 2830(k).

77. With respect to the "shelf-space" program involving Evergreen discussed above,

Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated that unbeknownst to

investors in the Evergreen Funds, "Morgan Stanley received monetary incentives [from

Evergreen] -- in the form of "shelf-space" payments -- to sell particular mutual funds [*i.e.,*

Evergreen Funds] to its customers. When customers purchase mutual funds, they should

understand the nature and extent of any conflicts of interest that may affect the transaction."

78. The investigation by the SEC and NASD and the resulting settlement with the

first target, Morgan Stanley, has received wide praise, including from members of Congress. As

stated by Sen. Peter Fitzgerald (R-Ill.) who is leading a Congressional inquiry of the mutual

funds industry:

> The settlement goes to show that the mutual fund managers as well
> as broker dealers have too often viewed mutual fund shareholders
> as sheep to be sheared. Congress has to figure out the variety of
> ways people are being sheared so that we can stop it.

*See* Brook A. Masters and Kathleen Day, *Morgan Stanley Settles with SEC, NASD; Firm Accused of Failing to Disclose Funds' Payments*, THE WASHINGTON POST, Nov. 18, 2003, at E1.

### Evergreen's Improper Shelf-Space Agreements With AG Edwards, Salomon Smith Barney, Merrill Lynch and Wachovia Securities

79.     Morgan Stanley was not the only brokerage firm that accepted payments from Evergreen in exchange for pushing investors into Evergreen Funds. During the Class Period, Evergreen also made "shelf-space" payments to other major brokerage houses including AG Edwards, Salomon Smith Barney, Merrill Lynch and Wachovia Securities.

80.     Regarding the shelf-space payments, Wachovia's website explicitly states that "[a]t Wachovia Securities, we receive payments from many of the companies whose funds we sell." Evergreen Funds are named as one of the mutual fund companies that pays Wachovia Securities. *See* http://www.wachovia.com/files/MutualFund_Guide.pdf.

81.     Additionally, in a June 2004 Salomon Smith Barney press release, Evergreen was identified as a Fund family that made revenue sharing payments to Salomon Smith Barney to push Evergreen Funds. *See* www.smithbarney.com/products_services/mutual_funds/investor_ information/revenueshare.html. The press release further states that "[f]or each fund family we offer, we seek to collect a mutual fund support fee, or what has come to be called a revenue sharing payment. These revenue sharing payments are in addition to the sales charges, annual service fees (referred to as "12b-1 fees"), applicable redemption fees and deferred sales charges and other fees and expenses disclosed in a fund's prospectus fee table." *Id.*

### Defendants Concealed Their Practices From Investors

82.     Defendants knew that these "shelf-space" arrangements present a clear, unmanageable conflict of interest, pitting the financial interest of the broker against that of its clients. Rather than disclosing this material information, Defendants knowing that a recommendation to purchase the Evergreen Funds would be completely undermined if clients

knew that the broker was paid from Fund assets to give it, concealed the truth regarding these revenue sharing arrangements.

### Defendants' "Shelf-Space Program" Created Undisclosed Conflicts of Interests

83.     Defendants' participation in "shelf-space programs" through the means described above created undisclosed, insurmountable conflicts of interest.  For example, Evergreen's participation in the "shelf-space program" at Morgan Stanley created a carnival atmosphere where brokers did everything they could to steer clients into Evergreen Funds in order to line their own pockets with money and prizes provided by Evergreen, with absolutely no regard for the financial well-being of their clients.  Such inherent conflicts of interest were plainly unmanageable.

### The Truth Is Revealed

84.     As discussed above, the truth about Evergreen began to emerge on November 17, 2003, when the SEC and the NASD censured Morgan Stanley for, among other wrongdoing, accepting Defendants' impermissible payments in exchange for aggressively pushing Evergreen Funds over other mutual funds.  On November 18, 2003, the *Washington Post* published an article which stated "Morgan said [the] companies in its 'Partners Program' included ... Evergreen Funds ..." among others.

85.     On January 14, 2004, *The Wall Street Journal* further explained the "shelf-space" relationship between Evergreen and brokerages including Morgan Stanley.  An article entitled "SEC Readies Cases On Mutual Funds' Deals With Brokers," citing "a person familiar with the investigation," reads that the SEC is "close to filing its first charges against mutual fund companies related to arrangements that direct trading commissions to brokerage firms that favor those fund companies' products."  The article stated in pertinent part as follows:

The SEC has been probing the business arrangements between fund companies and brokerage firms since last spring. It held a news conference yesterday to announce **it has found widespread evidence that brokerage firms steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements**.

Officials said the agency has opened investigations into eight brokerage firms and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing." Agency officials said they expect that number to grow as its probe expands. They declined to name either the funds or the brokerage firms.

The SEC said payments varied between 0.05% and 0.04% of sales and up to 0.25% of assets that remained invested in the fund. [. . .]

**People familiar with the investigation say regulators are looking into examples of conflict of interest when fund companies use shareholder money to cover costs of sales agreements instead of paying the sales costs themselves out of the firm's own pockets. The boards of funds, too, could be subject to scrutiny for allowing shareholders' commission dollars to be used for these sales agreements. In other cases, the SEC is probing whether funds violated policies that would require costs associated with marketing a fund to be included in a fund's so-called 12b-1 plan.**

*Id.* [Emphasis added.]

## THE EVERGREEN DEFENDANTS
## ENGAGED IN IMPROPER CONDUCT

### The Trustee/Officer Defendants Breached Their
### Fiduciary Duties To Evergreen Funds Investors

86.     Mutual funds' board of directors/trustees have a duty to protect investors and to closely watch that fees paid to an investment adviser are not excessive and that the Investment Adviser is acting in the best interests of the mutual fund investors. As explained by William Donaldson, the head of the SEC, in a January 7, 2004 speech to the Mutual Funds Directors Forum:

The board of directors of a mutual fund has significant responsibility to protect investors. By law, directors generally are responsible for the oversight of all of the operations of a mutual fund. In addition, under the

Investment Company Act, directors are assigned key responsibilities, such as **negotiating and evaluating the reasonableness of advisory and other fees**, selecting the fund's independent accountants, valuing certain securities held by the fund, and managing certain operational conflicts.

The role of fund directors is particularly critical in the mutual fund context because almost all funds are organized and operated by external money-management firms, thereby creating inherent conflicts of interest and potential for abuse. **Money-management firms operating mutual funds want to maximize their profits through fees provided by the funds, but the fees, of course, paid to these firms, reduce the returns to fund investors.**

Independent directors, in particular, should serve as "independent watchdogs" guarding investors' interests — and helping to protect fund assets from uses that will be of primary benefit to management companies. These interests must be paramount, for it is the investors who own the funds and for whose sole benefit they must be operated.

*See* http://www.sec.gov/news/speech/spch010704whd.htm. [Emphasis added.]

87.     The Investment Company Institute ("ICI"), of which Evergreen Funds is a

member, also recently described the duties of mutual fund boards as follows:

More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.

Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.

**Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.**

**In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.**

[Emphasis added.][2]

88.     Accordingly, Evergreen Funds' public filings state that the Trustees of Evergreen

Funds are responsible for the management and supervision of each respective Fund. In this

regard, under the heading MANAGEMENT OF THE TRUST, the SAI states, with respect to the

duties of Board members, as follows:

> The Trust is supervised by a Board of Trustees that is responsible
> for representing the interest of the shareholders. The Trustees
> meet periodically throughout the year to oversee the Fund's
> activities, reviewing, among other things, the Fund's
> performance and its contractual arrangements with various
> service providers.

89.     Another section of the SAI appears under the heading INVESTMENT

ADVISORY AGREEMENT and sets forth in greater detail the purported process by which the

investment advisor is selected:

> The Advisory Agreement continues in effect for two years from
> its effective date and, thereafter, from year to year only if
> approved at least annually by the Board of Trustees of the Trust or
> by a vote of a majority of the Fund's outstanding shares. In either
> case, the terms of the Advisory Agreement and continuance
> thereof must be approved by the vote of a majority of the
> Independent Trustees cast in person at a meeting called for the
> purpose of voting on such approval. The Advisory Agreement
> may be terminated, without penalty, on 60 days' written notice by
> the Trust's Board of Trustees or by a vote of a majority of
> outstanding shares. The Advisory Agreement will terminate
> automatically upon its "assignment" as that term is defined in the
> 1940 Act.
>
> In approving the renewal of the existing investment advisory
> agreement of each Fund, the Board of Trustees reviewed, on a
> Fund by Fund basis, the management fees and other expenses and
> compared the data to that of Funds of comparable size and

---

[2]  The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its
membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and
six sponsors of unit investment trusts. Its mutual fund members represent 86.6 million individual shareholders and
manage approximately $7.2 trillion in investor assets. The quotation above is excerpted from a paper entitled a
paper titled *Understanding the Role of Mutual Fund Directors* available on the ICI's website at
http://www.ici.org/issues/dir/bro_mf_directors.pdf.

investment objectives in the Lipper peer group. In addition, the Board of Trustees considered its discussions with management on the personnel and resources committed to management of the Fund and the nature and quality of the service provided to the Fund. In reviewing the overall profitability of the management fee to the Fund's investment advisor, the Board of Trustees also considered the fact that affiliates provide transfer agency and administrative services to the Fund for which they receive compensation.

90.     In truth and in fact, however, the Evergreen Funds Boards of Trustees were captive to and controlled by Evergreen, which prevented Evergreen Fund Boards of Trustees from fulfilling their statutory and fiduciary duties to manage and supervise the Evergreen Funds, approve all significant agreements and otherwise take reasonable steps to prevent Evergreen from skimming Evergreen assets and charging excessive fees. The Funds' Boards of Trustees were beholden to the Investment Adviser Defendant for their positions, not to the Fund investors. The Trustee Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendant and formed supposedly independent committees, charged with responsibility for billions of dollars of fund assets (much of which were comprised of investors' college and retirement savings). In this regard, the SAI stated as follows:

Under the terms of the Declaration of Trust, **the Trust is not required to hold annual meetings**...After the initial meeting as described above, **no further meetings of shareholders for the purpose of electing Trustees will be held**, unless required by law (for such reasons as electing or removing Trustees, changing fundamental policies, and approving advisory agreements or 12b-1 plans), unless and until such time as less than a majority of the Trustees holding office have been elected by shareholders, at which time, the Trustees then in office will call a shareholders' meeting for the election of Trustees.

[Emphasis added.]

91.     The Evergreen Trustees oversaw dozens of Evergreen Funds rendering it impracticable for them to properly perform their supervisory and monitoring functions. For example, during the Class Period, all Trustees of the Evergreen Funds at some point oversaw at

least 108 other portfolios or series in the Evergreen Fund complex. Therefore, the Evergreen Funds' Trustees functioned to falsely legitimize and validate Evergreen's improper conduct.

92. In exchange for creating and managing the Evergreen Funds, Evergreen charges investors a fee comprised of a percentage of each respective Fund's average daily net assets. Hence, the more money invested in the Funds, the greater the fees paid to Evergreen. In theory, the fees charged to Fund investors are negotiated at arm's-length between the Fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the Trustees' dependence on assets under management, and its failure to properly manage the Investment Adviser, a tremendous amount of fees were paid out of Funds' assets for services that were of no benefit to Fund investors.

93. As a result of these practices, the mutual fund industry was enormously profitable *for Evergreen.* In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . . [f]or the most part, customers do not enjoy the benefits of the economies of scale created by having larger funds. **Indeed, once a fund reaches a certain critical mass, the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true - once a fund becomes too large it loses the ability to trade in and out of positions without hurting its investors. [. . .]**
>
> **The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%. . . .** Fund vendors have a way of stacking their boards with rubber stamps. As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: "Tens of thousands of independent directors, over more than six decades, have failed miserably." A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never.

[Emphasis added.]

94.     Due in large part to the conflicted boardroom culture created by Evergreen's

Trustees, Plaintiffs and other members of the Class never knew, nor could they have known,

from reading the fund prospectuses or otherwise, of the extent to which Evergreen was using,

*inter alia,* so-called investment adviser fees, 12b-1 fees, Soft Dollars, and directed brokerage

commissions to improperly siphon investor assets to assist in peddling its wares on unwitting

investors.

### The Evergreen Defendants' Improper Use of Revenue Sharing and Excessive Commissions

95.     The Investment Adviser Defendant paid excessive commissions and directed

brokerage business to broker-dealers who steered their clients into Evergreen Funds as part of a

*quid pro quo* "shelf-space program" arrangement between Evergreen and brokerages. Such

payments were used to fund sales contests and other undisclosed financial incentives to further

push Evergreen Funds. These incentives created an undisclosed conflict of interest and caused

brokers to steer clients to Evergreen Funds regardless of the funds' investment quality relative to

other investment alternatives and to thereby breach their duties of loyalty. As described by the

National Association of Insurance and Financial Advisors:

> Directed brokerage results when a mutual fund manager uses
> commissions payable for executing the fund's securities trades to
> obtain a preferred position for the fund in the broker-dealer's
> distribution network. This practice creates numerous potential
> conflicts of interest, including possible incentives for broker-
> dealers to base their fund recommendations to customers on
> brokerage commission considerations rather than on whether a
> particular fund is the best match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.html.

96.     By paying the excessive commissions and directing brokerage business to

participate in "shelf-space programs," the Investment Adviser Defendant violated Section 12 of

the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan. Additionally, in several actions to date against brokerages and mutual funds, the SEC, the NASD and various other government regulators have made it clear that the use of excessive commissions and directed brokerage to participate in "shelf-space programs" -- as Evergreen has done here -- are highly improper.

97.     The SEC has brought actions against other mutual fund companies for the same type of behavior complained about here. As stated in a recent Administrative Proceeding against Massachusetts Financial Services, Inc. ("MFS"):

> **MFS did not adequately disclose to MFS shareholders that it allocated fund brokerage commissions to satisfy strategic alliances.**
>
> Specifically, Item 16(c) of the Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services."
>
> \*          \*          \*
>
> **The SAIs did not adequately disclose to shareholders that MFS had entered into bilateral arrangements in which it agreed to allocate specific negotiated amounts of fund brokerage commissions, subject to best execution, to broker-dealers for "shelf space" or heightened visibility within their distribution systems.**

*See* The March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions Against MFS, File No. 3-22450, *at* http://www.sec.gov/litigation/admin/ia-2224.htm [Emphasis added.]

98.     Similarly, in the Administrative Proceeding against Morgan Stanley, the SEC explained:

> At issue in this matter are two distinct disclosure failures. The first relates to Morgan Stanley DW's operation of mutual fund **marketing programs in which it collected from a select group**

> **of mutual fund complexes amounts in excess of standard sales loads and Rule 12b-1 trail payments. These programs were designed to specially promote the sale of those mutual funds with enhanced compensation to individual registered representatives, known as financial advisors ("FAs"), and branch managers as well as increased visibility in its extensive retail distribution network.**

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at* http://www.sec.gov/litigation/admin/33-8339.htm [Emphasis added.]

99. Most recently, on September 15, 2004, PIMCO fund affiliates entered into a settlement with the SEC. Similar to the allegations in this complaint against Evergreen, the SEC charged PIMCO entities with failing to disclose their use of directed brokerage to pay for shelf-space at brokerage firms. The Press release stated:

> The Securities and Exchange Commission announced today a settled enforcement action against the investment adviser, sub-adviser, and principal underwriter and distributor for the PIMCO Funds Multi-Manager Series funds (the PIMCO MMS Funds). The suit charges the entities with **failing to disclose to the PIMCO MMS Funds' Board of Trustees and shareholders material facts and conflicts of interest that arose from their use of directed brokerage on the PIMCO MMS Funds' portfolio transactions to pay for "shelf space" arrangements with selected broker-dealers.**
>
> \*       \*       \*
>
> Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated, "An investment adviser's undisclosed use of mutual fund assets to defray the adviser's, or an affiliated distributor's, own marketing expenses is a breach of the adviser's duty. Our action today — like the action brought by the Commission against Massachusetts Financial Services Company some six months ago — demonstrates the Commission's resolve to ensure that mutual fund shareholders know how their money is being spent."

*See* http://www.sec.gov/news/press/2004-130.htm. [Emphasis added.]

100. The excessive commissions and directed brokerage business used by Defendants, and considered improper by the SEC as noted above, did not fund any services that benefited the